HARLEM RIVER CONSUMERS
COOPERATIVE, INC., Plaintiff,

v.

ASSOCIATED GROCERS OF HAR-
LEM, INC., et al., Defendants.

No. 70 Civ. 4128.

United States District Court,
S. D. New York.

Feb. 18, 1976.

Cora T. Walker, New York City, for plaintiff.

Fanelli, Moore, Bosco, Penzel & McMillan, Craig D. Walley, Trial Counsel, New Rochelle, N. Y., for defendant Arnold Bakers, Inc.

Lovejoy, Wasson, Lundgren & Ashton, New York City, for defendant Bond Baking Div. of General Host Corp.

Bruckman & Bruckman, New York City, for defendant Dannon Milk Products, Inc.

Weil, Gotshal & Manges, New York City, for defendant Drake Bakeries.

Craig D. Walley, New Rochelle, N. Y., for defendant ITT Continental Baking Co.

Levy & Marcus, Queens Village, N. Y., for defendants Lazzara Products, Inc. and Pechter Baking Co.

Sullivan, Donovan, Hanrahan & Silliere, New York City, for defendant Oscar Mayer & Co., Inc.

Sullivan & Cromwell, New York City, for Sealtest Foods Div., Kraftco Corp.

Chadbourne, Parke, Whiteside & Wolff, New York City, for Sunshine Biscuits, Inc.

Turk, Marsh, Kelly & Hoare, New York City, for defendant S. B. Thomas, Inc.

Hall, McNicol, Marett & Hamilton, New York City, for defendant White Rock Corp.

Puglisi & Garber, Kew Gardens, N. Y., for defendant All Brands Candy & Nut Co., Inc.

Harold Unterberg, New York City, for defendant Associated Food Stores, Inc.

Abraham A. Salm, New York City, of counsel, to A. E. Robert Friedman, Brooklyn, N. Y., for defendant Better Brands of New York, Inc.

Julius Zizmor, New York City, for defendant Frommer Distributors, Inc.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendant Goya Foods, Inc.

Morris Bauman, New Hyde Park, N. Y., for defendant Lorenz Schneider Co.

Kelley, Drye, Warren, Clark, Carr & Ellis, New York City, for defendant Metropolitan Distributing Div. of the Guiness Harp Corp.

Goldberg & Gelman, White Plains, N. Y., for defendant Metro Pet Service, Inc.

Bernard J. Ferguson, Woodside, N. Y., for defendant Mid-Eastern Cooperatives, Inc.

Bell, Wolkowitz, Beckman & Klee, New York City, for defendant J. B. Dove & Sons, Inc.

Debevoise, Plimpton, Lyons & Gates, New York City, for defendant Hobart Manufacturing Co.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for Retail, Wholesale & Chain Store Food Employees Union, Local 338.

Roberto Lebron, New York City, for defendant Fedco Foods, Inc.

Berger, Kramer & Levenson, New York City, for defendant Sloan's Supermarkets, Inc.

Guggenheimer & Untermyer, New York City, for defendant Shopwell, Inc.

Stephen S. Saltz, New York City, for defendant Nestor Nestora.

Leo E. Panzirer, Donald J. Swords, New York City, for defendants Lawrence J. Overton, Hulan Jack, Co-ordinated Community Service, Inc.

Sirota & Kurta, New York City, for defendants Associated Grocers of Harlem, Inc., Colonial Supermarkets, Inc., Food Family, Inc., Aaron Kaufman, Harry Rosenblum, Theodore Solomon.

Linwood Joseph Overton, pro se.

PIERCE, District Judge.

## OPINION

This litigation is a private antitrust action. The plaintiff, Harlem River Consumers Cooperative, Inc. [the Co-op], which operates a retail food market, has sued thirty-eight defendants,[1] involved

---

1. The defendants in this action are: Arnold Bakers, Inc., Bond Baking Division of General Host Corporation, Dannon Milk Products, Inc., Drake Bakeries, ITT Continental Baking Co., Lazzara Products, Inc., Pechter Baking Co., Oscar Mayer & Co., Inc., Sealtest Foods Division, Kraftco Corp., Sunshine Biscuits, Inc., S. B. Thomas, Inc., White Rock Corporation, All Brands Candy & Nut Co., Inc., Associated Food Stores, Inc., Better Brands of New York, Inc., Frommer Distributors, Inc., Goya Foods, Inc., Lorenz Schneider Co., Metropolitan Distributing Division of the Guiness Harp Corp., Metro Pet Service, Inc., Mid-Eastern Cooperatives, Inc., J. B. Dove & Sons, Inc., Hobart Manufacturing Co., Retail, Wholesale & Chain Store Food Employees Union, Local 338, Fedco Foods, Inc., Sloan's Supermarkets, Inc., Shopwell, Inc., Nestor Nestora, Lawrence J. Overton, Hulan Jack, Co-ordinated Community Service, Inc., Associated Grocers of Harlem, Inc., Colonial Supermarkets, Inc., Food Family, Inc., Aaron Kaufman, Harry Rosenblum, Theodore Solomon, and Linwood Joseph Overton.

with various facets of the food industry, charging them with conspiring together in an attempt to drive the Co-op out of business, in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.[2] As will be described more fully below, the plaintiff has charged that certain defendants contrived to instigate a strike among the plaintiff's employees which resulted in a picket line being placed in front of the plaintiff's store. The other defendants are alleged to have used or been coerced into using what plaintiff describes as this "sham" labor dispute as a pretext for refusing to supply products and services to the Co-op, in furtherance of the alleged conspiracy.

On August 11-13, 1975, after the plaintiff rested its case, the Court heard argument on motions by all defendants for a directed verdict and for dismissal of the action pursuant to Rules 41(b) and 50(a), Fed.R.Civ.P. On August 27, 1975, the Court rendered an oral decision concluding that, as to thirty-five of the thirty-eight defendants, the motions were to be granted. The instant written opinion embodies in final form, the decision announced from the bench.

### History of the Litigation

Plaintiff filed this action on September 23, 1970, seeking injunctive relief and treble damages against the defendants. On October 8, 1970, plaintiff moved for a preliminary injunction against all of the defendants except certain retail grocery stores. The district court decided to bifurcate those preliminary proceedings, pursuant to Rule 42(b),

Fed.R.Civ.P., and after a six-day hearing issued a preliminary injunction, dated November 25, 1970, against ten of the defendants,[3] directing, *inter alia,* the cessation of the picketing of the plaintiff's premises. Upon the representation of the remaining supplier defendants, at a subsequent hearing on November 17, 1970, that they were willing to make deliveries and provide service to the Co-op as they had before the strike, no injunction was issued against the supplier defendants.

Plaintiff and the defendants then undertook what has proven to be the lengthy and sometimes tortuous task of litigating this multifaceted case.[4] The previous opinions of this Court speak for themselves in detailing the various pretrial hurdles which have been encountered in the effort to bring this case to trial.[5] There is no need to review these matters here. It suffices to say that there comes a time in the handling of a complex case when it simply becomes necessary to move beyond pre-trial proceedings to the trial of the action itself. See *Syracuse Broadcasting Corp. v. Newhouse,* 295 F.2d 269, 277 (2d Cir. 1961). In the opinion of this Court that point arrived for this case after the Court's rulings on the various summary judgment motions of the defendants.

Accordingly, beginning May 1, 1975 and continuing concurrently with the jury selection process and the beginnings of the trial, the Court held a series of conferences with all counsel to address such substantive and procedural issues as the use which could be made during the

---

2. The complaint also charged violations of the Robinson-Patman and Clayton Acts, 15 U.S.C. §§ 13 and 14. The plaintiff's evidence utterly failed to address the jurisdictional and substantive elements of these offenses and the Court considers them to have been abandoned.

3. The injunction issued against defendants Local 338, Co-ordinated Community Services, Inc., Associated Grocers of Harlem, Inc., Hulan Jack, Linwood Joseph Overton, Lawrence J. Overton, Theodore Solomon, Harry Rosenblum, Nestor Nestora, and Aaron Kaufman.

4. The Court wishes to extend its thanks to Magistrate Sol Schreiber for his able assistance in preparing this difficult case for trial.

5. See Opinions dated October 29, 1973 (motion to require Cora T. Walker to withdraw as plaintiff's counsel); February 7, 1974 (motion for further injunctive relief denied); October 9, 1974 (defendants' discovery motions under Rule 37, Fed.R.Civ.P.); April 30, 1975 (motions of thirty-eight defendants for summary judgment denied).

trial of prior court and administrative proceedings related to various facets of the Co-op's struggles, the definition of the conspiracy period as alleged in the complaint, the admissibility of pre and post-conspiracy period evidence, and whether the action could be allowed to proceed against certain defendants who had filed petitions in bankruptcy.[6] With these matters determined or under consideration, the plaintiff commenced the presentation of its evidence on May 20, 1975.

On August 8, 1975, with all aspects of the direct case but the reading of three depositions completed, the parties agreed that the plaintiff would rest its case. The three depositions were submitted to the Court along with written objections by the defendants with the understanding of all that the Court would consider the depositions on these motions after making written rulings on the objections. Further, all parties agreed that in the event that some or all of the motions were denied, the plaintiff could reopen its direct case for the limited purpose of reading these depositions to the jury. Thereafter, the Court devoted three days to hearing the arguments of counsel on motions to strike evidence and substantive motions directed to the sufficiency of the evidence. The Court then took the case under advisement.[7]

 The standards by which the motions for a directed verdict must be judged are well known. The Court is "bound to view the evidence in the light most favorable to [the Co-op] and to give it the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn." *Continental Ore Co. v. Union Carbide and Carbon Corp.,* 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962). Further, particularly in a case

such as this where the plaintiff relies on circumstantial evidence to support a finding of the conspiracy charged, the Court must consider all the evidence as a whole, without compartmentalizing or isolating the facts adduced as to one or another of the defendants or as to a particular aspect of the case. See *United Shoppers Exclusive v. Broadway-Hale Stores, Inc.,* 1966 Trade Cases, ¶ 71, 127 (N.D.Cal.1965). Of course the Court may not judge the credibility of witnesses in addressing these motions. It is for the jury to weigh conflicting evidence and determine credibility. See *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir. 1970); *Boeing Co. v. Shipman,* 411 F.2d 365, 375 (5th Cir. 1969) (*en banc*).

 If, after considering the evidence in accordance with these standards, the Court finds that "there can be but one conclusion as to the verdict that reasonable men could have reached" if presented with the evidence, *Simblest v. Maynard, supra,* and that that conclusion is opposed to a finding of liability, then it is the duty of the Court to direct a verdict in favor of the prevailing defendant. See *Baltimore & O. R.R. v. Groeger,* 266 U.S. 521, 524, 45 S.Ct. 169, 69 L.Ed. 419 (1925); *Independent Iron Works, Inc. v. United States Steel Corp.,* 322 F.2d 656, 661 (9th Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963).

Not unexpectedly for an antitrust case, the plaintiff here has relied almost exclusively on indirect and circumstantial evidence for the proof of its case. The Court recognizes that conspiracies are rarely susceptible of direct proof. See *Eastern States Retail Lumber Dealers' Ass'n v. United States,* 234 U.S. 600, 612, 34 S.Ct. 951, 58 L.Ed. 1490 (1914). Consequently, the Court has been liberal in allowing plaintiff to introduce evidence on the representation of its coun-

---

6. By order of the Court the transcripts of these pre-trial proceedings have been incorporated into and made a part of the trial record of this case.

7. At the request of the Court, plaintiff submitted an evidentiary memorandum purporting to detail the evidence constituting a prima facie case against the defendants. The Court *does not* adopt this memorandum or necessarily agree with the contentions therein.

sel that the relevance thereof would become apparent when the overall picture emerged. The task before the Court, now that plaintiff has rested, is to assess this overall picture to determine as to each defendant whether plaintiff has demonstrated the existence of evidence from which a jury could reasonably conclude that the elements of a conspiracy in violation of the antitrust laws has been proven.

## The Evidence

The evidence introduced thus far in the trial, viewed in the light most favorable to the plaintiff, is as follows:[8]

*Background.* The plaintiff Co-op was incorporated on February 15, 1967. (Ex. 2) An effort to sell shares began prior to the date of incorporation under the direction of the Co-op's first coordinator, Benjamin Armstead. (Allison, 7/24) The sales program under Armstead appears to have been sluggish. In June, 1967, however, the promotional work was placed in new hands and proceeded with markedly improved results. Volunteers were organized to promote the sale of shares throughout the Harlem area and beyond with the promise that the Co-op would sell quality food at a fair price. Clara Allison, among others, sold the shares from the Co-op office. (Allison 7/28) Eventually, by April of 1969, the Co-op had 4,300 shareholders.

During the period before the store opened, the Co-op received its principal organizational and training aid by means of a contract with Supermarkets General Corporation (SGC). By a contract entered into December 12, 1967 (Ex. 87), the Co-op obtained the services of three SGC individuals—Robert Blythe, Robert Higgins, and Leon Strauss. Blythe and Higgins, in particular, played a major role in selecting and training the Co-op's personnel and preparing for the store's opening. The plaintiff also received some aid from certain companies including Campbell's and from agencies such as the New York City Council for Economic Development. The defendant Mid-Eastern furnished some general promotional materials and films, but by and large the Co-op developed its own promotional literature. Furthermore, despite requests, the Co-op received little or no help from the Federation of Cooperatives or the New York State Food Merchants Association (NYSFMA). (Hildebrand 6/18) It must be noted as to the latter that the plaintiff was unable or unwilling to meet the organization's request for a consulting fee. (Hildebrand 6/18)

*June 4, 1968–April 21, 1969.* The Co-op opened its doors for business on June 4, 1968. Sales for the opening week were over $40,000 (Ex. 30A) and the opening was reported in the general and trade presses as an event of some significance. The Co-op was said to be an unusual store for the Harlem area and one which was capable of doing $1.8–2 million worth of business annually. (Exs. 137–148).

After the opening week, as is often the case (Blythe 5/21), the Co-op's sales dropped off, reaching the $40,000 level again only once, during Christmas week of 1968. (Ex. 30dd). During this period the Co-op experienced certain problems concerning personnel and other matters which necessitated continued training and monitoring by the SGC consultants (Higgins). Further, it appears that in the case of the Co-op, the policy of selling "quality food at a fair price" in fact often resulted in the acceptance of the manufacturer's suggested price on pre-priced items and in a mark-up which was, with the exception of a period of a few weeks, actually higher than that which one of plaintiff's expert witnesses described as the industry norm. (Blythe 5/21)

---

8. References to exhibits are designated Ex.; references to depositions read into the record as (witness) dep. at (page); and references to trial testimony by witness and the date of testimony. These references are the most convenient form available, given the fact that most of the trial was not transcribed.

Nevertheless, despite certain difficulties, one could fairly conclude from the evidence introduced that the Co-op operated successfully from June 4, 1968 until April 19, 1969. In fact, plaintiff's consultants, Blythe and Higgins, testified that by the end of 1968 the Co-op had enough money in the bank to expand and it appears that at least one organization sought to loan the Co-op money. It must be noted, with respect to the testimony regarding proposed expansion, that while at least one site was explored, it appears that no definitive decision was made about selecting a particular site during the relevant time period and plaintiff's consultant Blythe cautioned that even though, in his view, adequate capital for expansion was available, the Co-op should be wary of expanding without first developing a sufficient reservoir of trained personnel. (Blythe 5/20) There is no evidence of any expansion discussions taking place later than December, 1968. With the exception of a mention in one news article (Ex. 140) there is no evidence that the previous discussions were made known to the trade or general public.

According to the plaintiff's complaint, it was at or about the time of the store opening that the conspiracy against it began. (Complaint ¶ 32) Before exploring the evidence with respect to this charge, it may be well to describe some of the persons and organizations which were active in the retail food industry in the Harlem area at the time the Co-op appeared.

*Local 338.* The Retail, Wholesale and Chain Store Food Employees Union, Local 338 (Local 338 or the Union) was the principal union representing food store employees in the Harlem area. The President of the Union at the time the Co-op commenced its business was Julius Sum. However, the affairs of the Union in Harlem were almost exclusively under the direction of Linwood Joseph Overton (Joseph Overton) who was the union's business agent for Harlem at that time and had been since 1944. (Sum 6/25) Julius Sum testified that

Joe Overton had the power to sign contracts for Local 338 as long as they involved the Harlem area.

Also involved with the Union was Lawrence Joseph Overton (Lawrence Overton), Joe's brother. Lawrence Overton had been a union member for eighteen years, a section chairman, a member of the Union Welfare Board, and was a member of the Local 338 Executive Board from June, 1969 until at least July, 1970 at which time he submitted a letter of resignation. Leonard Faust (Faust), named in this action as a non-defendant alleged co-conspirator, was not a member of Local 338 in June, 1968, but had been from 1943 until April, 1968.

*CCS.* Co-ordinated Community Service, Inc. (CCS) was a promotional organization located in Harlem. The organization sponsored the products of its clients who were manufacturers of national brand products, to wit, White Rock, Borden's (milk and ice cream), ITT Continental Baking Co. (Hostess Cake and Wonder Bread), Ballantine Beer, Ehler's spices, and Sylvania light bulbs. (Exs. 199a, 200, 201a, 202, 203). CCS promoted these products in part by visiting stores, primarily in the Harlem area, with representatives of these companies. The purposes of those visits were twofold. Where the store owner already carried the client's products, the CCS representative would check the shelves and perhaps inquire about acquiring a preferred position or arranging a special promotion or display. Where the client's products were not being stocked, an effort would be made to encourage the store to carry the products. Sometimes the stores to be visited would be chosen by the client's sales personnel and at other times CCS would suggest stores to be visited.

The evidence shows that prior to 1966, CCS (or its predecessor) was owned by Lester Wolf, Harry Taxin, and Irving Hertz. In 1966, the corporation was purchased by Hulan Jack (Jack), Theodore Solomon (Solomon), Harry Rosenblum (Rosenblum), and L. Joseph Overton. (Ex. 394) The shares issued to L. Joseph

Overton at the time of purchase were later cancelled and transferred to Emancipation March, Ltd. (EML) (Ex. 394), a corporation in which one could reasonably conclude Linwood Joseph Overton had an interest (Ex. 210), although certain documents were signed by Lawrence J. Overton on behalf of EML. (Exs. 211, 213, 214) Joseph Overton paid for the shares transferred to EML (Jack 6/12). Further, while a restrictive shareholder agreement dated February 11, 1966 was entered into by the parties (Ex. 211), a separate agreement of the same date was executed by them allowing Emancipation March, Ltd. to transfer its shares to L. Joseph Overton without the consent of Solomon, Rosenblum, and Jack. Thereafter, CCS checks were issued to L. Joseph Overton (Ex. 347e) and to a Diner's Club account which a jury could reasonably find belonged to Linwood Joseph Overton (Ex. 347f; Baken, 6/17) which equalled in total amount the dividend checks paid to CCS principals Jack (Ex. 347), Solomon (Ex. 347b), and Rosenblum (Ex. 347a). There is also evidence from which it could be concluded that L. Joseph Overton was initially elected chairman of the CCS Board of Directors (Ex. 193). While there may be some question as to whether the L. Joseph Overton referred to in these various documents was Lawrence or Joseph, the evidence is such that a jury could reasonably find that Linwood Joseph Overton was in effect a 25% owner of CCS, or that he was at least intimately connected with CCS and had a financial stake in its operations.

Lawrence Overton was also connected with CCS. He was a CCS employee and received salary checks from it at the same time that he was active in union activities (Ex. 347c). He served as secretary and Executive Director of CCS. (Lawrence Overton, 6/12). He was also the owner of three grocery stores in Harlem.

As executive director of CCS it was within the scope of Lawrence Overton's duties to conduct the store visits described above, to make reports to the CCS clients, and to meet with the clients to discuss CCS's performance. (Lawrence Overton, 6/12)

Faust was also connected with CCS, working as a field representative and receiving salary checks from CCS between June, 1968 and July, 1970. (Faust, 6/26; Ex. 347d) He succeeded Lawrence Overton as executive director in 1969. (Faust, 6/26)

Thus, the evidence shows an inter-relationship between CCS and the two Overtons and Faust which gave this independent marketing agency a distinctly union-oriented cast. Further, there is evidence from which one could reasonably conclude that CCS used its union connections and influence to its advantage in that clients were aware of the presence of Joseph Overton in the background and believed his union contacts would be beneficial in promoting CCS-sponsored products in the Harlem area. (Cooke, 6/24; Doherty, 6/23) The evidence is clear that the CCS promotional work was not always successful, even in stores where the clerks were 338 members. (Larry Overton, 6/12) Nevertheless, one could also reasonably conclude from the evidence that CCS business improved considerably after the new people took over in 1966, even though according to one of the principals, the basic methods of promoting products did not change. (Solomon dep. at 31)

*AGH.* Associated Grocers of Harlem, Inc. (AGH) was a trade association made up of the owners of 80–90 Harlem grocery stores. It provided various services for its members, including the negotiation of a union contract with Local 338. (Solomon dep. at 7)

Solomon, of CCS, was executive secretary of AGH when the Co-op opened and had been since 1945. (Solomon dep. at 7) When Solomon visited AGH stores, he would discuss the CCS client's products. Further, there is evidence that CCS products were discussed and promoted at AGH meetings and that AGH members received a monthly rebate from CCS in return for promotional efforts on behalf

of the products. In fact, according to Kaufman's deposition testimony, AGH would have been unable to continue operations without these payments.

It is around these organizations—CCS, AGH, and Local 338—and the individuals involved in them that plaintiff claims the conspiracy was formed with the aim of either forcing the plaintiff to do business in a certain manner—i. e., with its managers and assistant managers included in the coverage of a Local 338 contract—or of putting the plaintiff's store out of business.

There were, of course, other forces present within the industry at this time including the various product manufacturers and distributors, some of whom are defendants in this action; operators of stores in what plaintiff has defined as the Harlem target area, such as Fedco, Sloan's and Shopwell; and those with other interests in the retail food market in that area. The evidence as to their role in these events will be described later.

Beginning at about the time the plaintiff's supermarket opened, CCS personnel made various overtures to the plaintiff in an effort to persuade it to feature the products of the CCS clients. One of plaintiff's SGC consultants, Blythe, testified that in May, June, or July of 1968, Linwood Joseph Overton approached him and told him the Co-op was carrying the wrong products. According to Blythe, Overton specifically mentioned that the store should be stocking White Rock soda and Ehler's spices. (Blythe, 7/23) Prior to the Co-op's opening, Hulan Jack, the CCS President, sent a letter to Mrs. Cora Walker, co-ordinator and legal counsel for the Co-op, asking for the opportunity to meet with the Co-op board to discuss placing CCS sponsored products in the store. (Ex. 188) There is no evidence that such a meeting was ever arranged and Jack turned the promotional efforts with respect to the CCS-sponsored products over to Faust and

Lawrence Overton who made their own efforts. (Solomon dep. at 130)

The evidence indicates that during 1968 at least two incidents occurred concerning the stocking by plaintiff of particular CCS-sponsored products, those of ITT Continental and White Rock. Charles Cooke of ITT Continental testified that in May of 1968 he went to the plaintiff's store along with Harry Smalls, the company's merchandising representative, who spoke to someone in the store. Cooke personally made no arrangements to tape the plaintiff's bread shelves, that is, to mark out the portions of the shelves where his company's products would be displayed. According to the testimony of Leonard Faust, of CCS, Faust later went to the store and made arrangements to allow Smalls to tape the Co-op's breadstand for ITT Continental's Wonder Bread.[9] Smalls was later directed by plaintiff to remove the taping and did so. (Faust, 6/26)

The second "incident" occurred in the fall of 1968 when plaintiff's consultant, Robert Blythe, noticed that White Rock beverages were over-stocked in the store and reported this fact to the appropriate store committee. (Blythe, 5/20) Blythe testified that White Rock had not been in the store when it opened, but that he could not be sure whether or not it had been authorized by the appropriate store committee in the fall of 1968. There was no testimony as to whether any complaint was ever made or any action taken with respect to White Rock.

During this same period of time, the fall of 1968, Local 338 began to negotiate with the plaintiff with respect to the signing of a union contract on behalf of the plaintiff's employees. In November and December of 1968, a series of meetings were held, attended by both Joseph and Lawrence Overton who negotiated on behalf of the union. (Exs. 624–627) Leonard Faust, who was not a member of Local 338 at this time, testified that he attended one of these meetings but

---

9. There was evidence to indicate that the retaping of shelves in a store could be of significant value to a manufacturer, increasing sales by as much as $100 per week.

only as an observer who happened to be present. (Faust, 6/26) However, there is evidence from which it would be reasonable to conclude that Faust was present at the four sessions which took place during this two month period. (Exs. 624–627) Therefore, in the Court's view, the evidence could support a finding that during this time period, these three CCS-affiliated persons were regularly—and, in the case of the Overtons, importantly—involved in the union's negotiations with the plaintiff Co-op.

Events moved quickly after December 1968. On December 20, 1968 an agreement was signed between persons purporting to represent the Co-op and representatives of the Union. The Co-op representatives agreed to convene a board meeting "for the purpose of ratification of the union's [proposed] contract." In return, the Union representatives agreed there would be "no strikes, no picketing, and no slow up" by the employees. (Ex. 396)

Signing this agreement for the Co-op were Florence Rice, Chairman of the Board and President, Courtney Brown, a board member, and Frank Anastasio, of the Mid-Eastern Co-op; signing for the Union were the two Overtons. Plaintiff's witnesses testified that none of those persons signing the agreement for the Co-op had been authorized by the Board to do so, and further, that none of them reported to the Board about either the meeting or the agreement.

No Local 338 contract was signed within the time specified in the December 20, 1968 agreement. However, various facets of the proposed union contract were discussed at Board meetings in January, 1969. (Higgins, 6/2) Then, at a meeting with Co-op representatives on January 20, 1969, at which both Overtons again were present, a document purporting to be a contract between the Co-op and the Union was signed. Plaintiff's witnesses, including Board members who claimed to have first heard about the signing of the contract when it was reported in the newspaper, testified, however, that the Board had not authorized anyone to sign a contract for the Co-op.

On February 23, 1969, a meeting of the Co-op's shareholders was held. The shareholders voted out the old Board of Directors in its entirety, voted in a new Board, and voted "to invalidate the contract that was signed by the old Board." (Strong, 6/3; Local 338 Ex. R–1)

Following the February 23, 1969 shareholders' meeting, several meetings were held between the Co-op's employees and the Co-op personnel committee at which petitions were presented and grievances were aired. (Local 338 Ex. T) A chaotic meeting at which Joseph Overton was present, was held on April 19, 1969. No resolution was reached on the various issues about which the employees and the Co-op were in disagreement. Another meeting, chaired by Marjorie Strong, who had been elected to plaintiff's Board of Directors on February 23, 1969, was held on Sunday, April 20, 1969. At that meeting Strong told the employees that the Board would take its next step with respect to a contract as soon as it was able to do so. She asked the employees to bear with the Board. Strong asked one employee, Vivian Dixon, if the employees were going to strike and Dixon said "No." (Strong, 6/4) The next day, April 21, 1969, the employees went out on strike.

*April 21, 1969–September 23, 1970*

With the start of the strike, the plaintiff dispatched Mrs. Venus Harris (Harris), from her position as a staff worker in the Co-op office to the store to serve as store co-ordinator and do whatever she could to keep the store open. Mrs. Harris testified that her principal responsibility in this regard was to get merchandise for the store. According to her testimony, the Co-op still had plenty of customers. (Harris, 7/9) Mrs. Harris testified that in order to obtain merchandise, beginning in May, 1969, she called all of the Co-op's authorized suppliers,

including, with one or two exceptions, the supplier-defendants in this action.[10]

Telescoped considerably, the essence of Mrs. Harris' testimony and that of Mrs. Sadie Badon (Badon), who also worked as co-ordinator for several months during the strike, was that calls were made regularly to each supplier between May of 1969 and May of 1970 asking for deliveries to the Co-op, or deliveries at some other place such as the Co-op office or to a street corner, or for permission to pick up the merchandise at the supplier's warehouse or plant. In most instances, neither Harris nor Badon could remember to whom she spoke, or how many times she called, or exactly what she said, but each testified that for the most part, the defendant-suppliers did not take orders and that, in those few instances where they did, deliveries were not received. According to these witnesses, often the suppliers did not even give the caller a chance to place an order, once she had identified herself as calling from the Harlem Co-op. Those witnesses also testified that in an effort to get merchandise, the Co-op had rented a truck which was available to go "anywhere" for supplies, that volunteers used their cars to pick up groceries on street corners at night and bring them to the store, and that throughout this period the store had plenty of customers—there was no consumer boycott of the store. (Allison, 7/23)[11]

During this entire period, and indeed through September 23, 1970, while the picket line remained outside the plaintiff's store, the defendant-suppliers continued to sell to other stores which plaintiff describes as its competitors. There is no evidence that any of the suppliers

stopped selling to other stores in the Harlem area during this time—though there is also no evidence any other store had a picket line in front of it. The refusal of the various suppliers to sell to the plaintiff continued, despite the Co-op's efforts by means including a newspaper advertisement and a letter to suppliers, to inform the public and the suppliers of the Co-op's urgent need for goods and of the nature of the strike. (Ex. 486).

The conduct of the strike deserves some comment. While there is no direct evidence as to how the strike came about, the evidence at the end of the plaintiff's case is such that a jury could reasonably conclude it was called by Joseph Overton. He, himself, stated at his deposition that he "maintained" the strike, he had broad powers with respect to union affairs in Harlem (Sum, 6/25), and the Executive Board minutes of Local 338 indicated that the Union had backed Joseph Overton on this strike.

Joseph Overton himself was present at the strike scene about three days a week. Lawrence Overton also walked the line to a certain extent, as least between May, 1969 and October, 1969, and possibly through January, 1970. (Lawrence Overton, 6/16) Leonard Faust, although not a member of Local 338 at the time of the strike, also walked the picket line.

The evidence introduced on the plaintiff's case points to an overall picture of a "peaceful" and "harmonious" strike. This is not to say that it was not considered important by the Union. The strike, Local 338's first in twenty years, was well supported by the Union. According to Local 338's own records the Union allocated $140,000 of its expenses between May, 1969 and December, 1970

---

10. This testimony was admitted over the objection of many of the defendants who claimed it was contrary to the information provided by plaintiff through answers to interrogatories and should therefore be excluded, pursuant to Rule 37, Fed.R.Civ.P.

11. There was some variation in the testimony with respect to some of the supplier defendants. For the most part, however, the Court

does not find that this voluminous testimony warrants detailed treatment. Even ignoring particular "redeeming" factors as regards certain defendants and putting the "worst" light on the behavior of all, the Court finds the plaintiff's proof to be insufficient to meet the legal standards which would have to be satisfied in order to hold these defendants liable as having participated in the alleged conspiracy.

to the Co-op strike. (Ex. 577) The expenses included rental of a mobile home which was parked in front of the store, was supplied with TV and air-conditioning, and which was used to provide the pickets with food, beverages, and a place to relax. The strike was well supplied with pickets, many of whom were not and had not ever been employees of the plaintiff. (Rosenblum) And, the fact is inescapable that the strike did last for nineteen months. Nevertheless, with the exception of two incidents testified to on cross-examination by Mrs. Allison—neither involving a defendant in this action—the plaintiff's evidence shows no violence occurring on the line with respect to either customers or suppliers. Lawrence Overton testified that he never saw a supplier threatened. (Lawrence Overton, 6/16) While Clara Allison said she often walked the pavement outside the store during the strike, she stated this was to serve as a "welcoming committee" and was not necessary to coax customers into the store or "to protect" them.

Negotiations aimed at settling the strike and arriving at an acceptable union contract were conducted during the course of the strike with the plaintiff being represented by Harold Young (Young), a labor lawyer retained by the Co-op in June, 1969. First a series of seven sessions were held at the Commodore Hotel in June and July of 1969. These were followed by three sessions with the Federal Mediation Service, contacted by Young, in August of 1969. After these sessions, there was a private meeting between Young and Cora Walker representing the plaintiff and Julius Sum, and Joseph Overton, representing the Union. This meeting was followed in turn by the submission by the plaintiff of a final offer to the Union. The Union never responded to this final offer. (Young, 8/4)

During these discussions a number of different issues were raised and the positions of the parties were reflected in various written proposals. These issues included the length of the probationary or training period for new employees, the wage scales to be paid, payments by the Co-op to employee benefits programs, overtime pay, issues relating to the circumstances under which plaintiff could fire its employees, and whether or not managers and assistant managers would be covered by the Local 338 contract. (Local 338 Ex. Y–2; Linwood Joseph Overton Ex. G) During the course of these negotiations, in which Local 338 was represented by Joseph Overton and its attorney, Arthur Garfinkle, Overton offered to submit the issues to binding arbitration. Young testified that he advised the plaintiff against accepting arbitration since he did not believe in a third party writing a contract for either the union or management. (Young, 6/3) He testified further that it was his recollection that wages, benefits, and other economic matters were not major points of dispute by the end of the negotiating sessions. Finally, he testified that at the last negotiating session in November of 1969, the *first* meeting attended by Julius Sum since the beginning of the strike, Sum stated that he could not get Joseph Overton to accept certain terms in the contract; that this was Joe's area and that Joe was the person who was responsible for the negotiations. (Young, 6/3) Although Sum testified at trial that he had told Joseph Overton, Florence Rice, and Cora Walker that he would be willing to exempt the Co-op's managers from the contract if that would be necessary in order to settle the strike, there is no evidence that this offer, if made, was ever followed up in the negotiating sessions, at least not in terms of exempting these employees by position. Nor, is there evidence of any further negotiations after this November, 1969 meeting. One year later, plaintiff filed the present lawsuit.

Just as there was a background against which plaintiff made its entry into the food industry, there were a number of events which occurred during the alleged conspiracy period to which plaintiff attaches significance in its anal-

ysis of the evidence it has presented on its direct case. These can be noted at this point as part of the context in which the liability of the defendants will be measured.

At least two conventions of the New York State Food Merchants Association (NYSFMA) appear to have been held during the relevant time period. One, which occurred in Puerto Rico in March, 1969 featured as a part of its program a panel discussion on the subject "Problems in the Changing Communities", chaired by a member of the AGH Board of Directors. (Hildebrand, 6/18) This convention was held at a time when several of the defendant competitors were members of NYSFMA. Also, some of the defendant suppliers were among one hundred or so exhibitors who attended the convention. (Hildebrand, 6/18; Shopwell Ex. B)

Testifying regarding conversations at the March, 1969 convention was William Hildebrand, the President of the NYSFMA. He testified that the Harlem River Co-op was not discussed at this or any other meeting of the association. Nor, he testified, was there any discussion at the March, 1969 convention of an article concerning the Co-op which had appeared in a NYSFMA publication prior to the convention.

A second NYSFMA convention also occurred during the relevant time period. This convention, which was held at the Concord Hotel in New York in 1968 (Hildebrand, 6/18) appears to have been one attended by Lawrence Overton on behalf of CCS (Lawrence Overton, 6/16) as well as by Jack, Solomon, and Rosenblum. Overton testified that he wore a button identifying himself as being from CCS and giving his address. He also stated that he spoke to suppliers about CCS and tried to learn how conventions of this sort worked.

A similar event, another food convention, took place in New York City just prior to the opening of plaintiff's store. This was a New York City-wide food convention sponsored by AGH. Hulan Jack of CCS was notified of the convention both by letter and by a telephone call from Theodore Solomon. Upon receiving notice, Jack in turn notified the CCS clients that it would be in their interest to be at the convention and to have exhibits there. Jack himself attended the convention and visited the booths of the CCS clients. (Jack, 6/11)

### Discussion, Federal Claims

In order to prevail in a private antitrust action, a plaintiff must show that a violation of the antitrust laws occurred, that the plaintiff was damaged as a result, and the amount of damages. (Since the trial of this action has been bifurcated into liability and damage portions, the last of these concerns is not before the Court with respect to the instant motions.) In this action, the plaintiff claims that violations of both federal and New York State antitrust laws have occurred as a result of a conspiracy among the defendants, centering around the picket line in front of the plaintiff's store and aimed at driving the plaintiff out of business if it refused to do business in the manner sought to be imposed on it as described hereafter. Plaintiff's complaint does not charge individual defendants with violations of the antitrust laws, other than participation in the alleged conspiracy. In other words, no individual or unilateral antitrust violations are charged. The complaint relies solely on charges of concerted action by the defendants.

Given the nature of the charges, the method of analysis must be to determine first whether plaintiff has introduced evidence from which the existence of a combination, agreement, or conspiracy could reasonably be inferred. If plaintiff has introduced such evidence, it must next be determined whether the agreement shown is such as to constitute a restraint of trade under Section 1 of the Sherman Act, a conspiracy to monopolize under Section 2 of the Sherman Act, or a conspiracy in violation of the New York State antitrust laws.

"The substantive law of trade conspiracies requires some consciousness

of commitment to a common scheme. *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., et al.,* 346 U.S. 537, 540–541, 74 S.Ct. 257, 98 L.Ed. 273 . . . ." *United States v. Standard Oil Co.,* 316 F.2d 884, 890 (7th Cir. 1963). However, it is rarely possible to prove such conspiracies by direct evidence of agreement. See *Eastern Retail Lumber Dealers' Ass'n v. United States, supra,* 234 U.S. at 612, 34 S.Ct. 951. Here, the plaintiff has readily acknowledged throughout the preparation and trial of this lawsuit that it has no published reports of predatory plans by the defendants and that it has been privy to no secret meetings at which conspiratorial plots were hatched. In short, plaintiff has acknowledged that it has no direct evidence of a conspiracy to support its case. Plaintiff claims, however, that the inference of conspiracy can be gleaned from the overall pattern of events described above. In analyzing this mass of circumstantial evidence, it may be helpful to refer to what have been identified as three components which may contribute to or add up to a finding of conspiracy: motive to conspire, opportunity to conspire, and the consistency of the overt acts of each defendant with acts of the others. See *Overseas Motors, Inc. v. Import Motors Ltd.,* 375 F.Supp. 499, 531–32 (E.D.Mich.1974), *affirmed,* 519 F.2d 119 (6th Cir. 1975).

■ Starting at the core of the alleged conspiracy, the Court concludes that the evidence is such that a jury could reasonably infer that an agreement existed between Linwood Joseph Overton, Lawrence J. Overton, and non-defendant alleged co-conspirator Leonard Faust to use the union power of Local 338 to coerce the Co-op into doing business in a manner which these three believed would be beneficial to the promotion of CCS-sponsored products, i. e., with managers and assistant managers brought under the aegis of Local 338. Further, a jury could conclude that having failed to extract an agreement from the plaintiff to do business in this manner, these three individuals agreed to instigate the strike against the Co-op to put it out of business, if it would not comply with their wishes, by depriving the store of the goods and services of suppliers who would not cross the picket line. The Court believes that a jury could draw these inferences from that evidence in the case which could lead a jury to conclude that all three individuals had a financial and/or employment interest in CCS; all three had connections with Local 338; all three took part in the approaches to plaintiff on behalf of CCS in an effort to promote the CCS-sponsored products; all three took part in the Local 338 contract negotiations with the Co-op before the strike; and all three participated in and supported the strike itself.

In addition to these conclusions which could be drawn by a jury from the evidence submitted, there is evidence of at least one other occasion, during the relevant time period, when Joseph Overton, in the presence of Lawrence Overton and others, sought to use his Union power in a coercive manner for the benefit of CCS business interests. In this instance, according to the testimony of Colin David Cuccia, a distributor of Sylvania products, Joe Overton threatened to throw him out of Harlem if he failed to pay CCS $3,000.

The Court is of course not ruling that the state of facts set forth *supra* has been conclusively established by the plaintiff's evidence. The Court is well aware of evidence from which contrary inferences concerning the reason for the strike could be drawn. But, the Court may not weigh conflicting permissible inferences in judging the present motions. See, e. g., *Simblest v. Maynard, supra; Boeing Co. v. Shipman, supra.* At the close of the plaintiff's evidence, this Court cannot say that a jury finding of an agreement among the Overtons and Faust as set forth above could rest on no substantial evidence. See *Armco Steel Corp. v. Realty Investment Co.,* 273 F.2d 483 (8th Cir. 1960).

■ Having found that a jury could reasonably conclude that an agreement

as set forth above existed among the Overtons and Faust, it follows without more that the statutory immunity from the antitrust laws, provided for labor unions by § 6 of the Clayton Act, 15 U.S.C. § 17, will not exempt the Union from liability in this case. The law has been clear for at least thirty years, that a union may not, "consistently with the Sherman Act, aid non-labor groups to create business monopolies and to control the marketing of goods and services." *Allen Bradley Co. v. Local Union No. 3*, 325 U.S. 797, 808, 65 S.Ct. 1533, 1539, 89 L.Ed. 1939 (1945). When a union does combine with business for such purposes it loses whatever immunity has been granted with respect to actions taken for "the purpose of mutual help." *Id.* at 808–09, 65 S.Ct. 1533. In this case, were a jury to find, as it might, that the Co-op strike was called for the benefit of CCS by Joseph Overton on behalf of the Union, then the jury could well conclude that a prohibited combination of union power and business interests had occurred. In fact, it is this Court's view that the jury in this case could find that Joseph Overton himself embodied that combination.

The fact that a jury could make findings which would lead to a conclusion that the Union had no immunity under the antitrust laws does not, however, settle the issue of the Union's possible liability. Even if the Union's immunity is lost, there is a separate question—to be discussed infra—as to whether the Union as an entity can be held liable in this context for the acts of its agent.

Besides the Overtons, Faust, and the Union, plaintiff contends that the "core" group, at the center of the conspiracy, also included CCS and AGH as corporate organizations, various individuals involved with one or both of them, to wit, Theodore Solomon, Harry Rosenblum, Hulan Jack, Aaron Kaufman (Kaufman); and Nestor Nestora (Nestora), and Colonial Supermarkets, Inc. and Food Family, Inc., two corporations owned wholly or partially by Kaufman and Rosenblum, respectively. The evidence plaintiff has introduced unquestionably reveals a complex of interrelationships among these individuals, both in and around AGH and CCS and to a somewhat lesser extent, through Local 338. Such evidence is not necessarily either surprising or damning, given the fact that all made their livelihood working within the same industry and the same geographic area. The question before the Court is whether the evidence with respect to these individuals and their organizations shows not only a community of interests, but also participation in a conspiracy directed against the plaintiff. Consideration of these questions requires an examination of issues of agency as well as of the components of conspiracy, that is, motive, opportunity, and overt acts.

■ *CCS and its principals.* The evidence, viewed most favorably to the plaintiff's theory, would allow for a finding that at the time the strike was called, both Joseph and Lawrence Overton held positions with CCS which would allow them to act as agents for CCS—Joseph as a consultant and Lawrence as a paid employee. It could also be concluded that Joseph (or Lawrence) was a 25% shareholder in CCS.

■ No agency relationship may be inferred between CCS and either Overton merely from the fact, should it be found, that one or both was a shareholder in CCS. As a general matter, the fact that a person is a shareholder does not give him authority to act for the corporation. See *Studebaker Corp. v. Allied Products Corp.*, 256 F.Supp. 173 (W.D.Mich.1966); *Hermusic, Ltd. v. Reverse Producers Corp.*, 254 F.Supp. 502 (S.D.N.Y.1966). Similarly, an individual director has no power to act on his own on behalf of the corporation. See Restatement Agency 2d, § 14C.

If a jury were to find that Joseph and/or Lawrence Overton had authority to act for CCS in some capacity at the time of the strike, the next question to be faced would be whether calling a union strike for the benefit of CCS clients—an act which would be in viola-

tion of the law—would be within the scope of the authority granted by CCS.

The plaintiff has submitted no direct evidence, by means of corporate minutes or records, or by means of conversations or statements by CCS principals, which would demonstrate that either Overton had authority to take such action on behalf of CCS. "Authority to do illegal or tortious acts, whether or not criminal, is not readily inferred." Restatement Agency 2d § 34, comment g.

Plaintiff has also failed to submit evidence, admissible against CCS as a corporation, from which a jury could reasonably infer that either Overton was ever authorized on other occasions to perform illegal or tortious actions on behalf of CCS. While a principal, including a corporation, may be held liable for illegal actions committed by its agents in the course of their employment and within the scope of their authority, see, W. Knepper, *Liability of Corporate Officers and Directors,* § 5.04 (2d ed. 1973), plaintiff has not shown that any acts either Overton may have committed in furtherance of the alleged conspiracy were acts undertaken pursuant to a grant of authority by CCS.

Nor has plaintiff offered any evidence, direct or circumstantial, from which a jury could reasonably infer that CCS ratified any illegal actions the Overtons might be found to have taken in connection with the Local 338 picket line. There is evidence tending to show that CCS clients renewed their contracts with CCS while the strike was in progress. However, there is absolutely no direct evidence which ties these renewals to the strike in any way. Nor is there circumstantial evidence to indicate that renewal of the contracts was somehow unreasonable or unsound from a business standpoint, raising an inference that the renewals must have been effected for some other purpose, i. e., to reward CCS for the conduct of the strike against the Co-op. In fact, what evidence there is suggests the CCS clients were satisfied with the performance of

CCS and had objective reasons for their satisfaction. Accordingly, there is no basis in the evidence presented by plaintiff for holding CCS as a corporation liable in this case.

The next question to be faced is whether there is any evidence from which a jury could infer that the CCS principals, Jack, Solomon, and Rosenblum, would be liable to the plaintiff, either by virtue of any acts the Overtons might be found to have undertaken to promote the CCS-sponsored products, or on some other ground.

A corporate officer or director is not liable for the illegal actions of others in the corporation merely by virtue of his position or office. He may become liable if he knowingly participates in such actions. See M. Fener, *Personal Liabilities of Corporate Officers and Directors,* 217 (1961). Cf. *United States v. Wise,* 370 U.S. 405, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962).

There is evidence in the present record from which it could be inferred that the CCS principals, Jack, Solomon, and Rosenblum, knew that CCS had used union influence to help promote its clients' products. There is evidence that each of them knew of the existence of the picket line. And, it could reasonably be inferred that they knew Joseph Overton, as Local 338's business agent, was in charge of the picket line. However, even if a jury were to find that the purpose of the picket line was in fact to promote the CCS method of doing business and thereby promote CCS-sponsored products, plaintiff has presented no evidence from which the next step in the case against the CCS principals can be inferred, i. e., that they knew that this was the purpose of the picket line, or that they participated in the scheme alleged by the plaintiff. If plaintiff's circumstantial evidence against Jack, Solomon, and Rosenblum is analyzed in terms of motive, opportunity, and consistency of overt acts, see *Overseas Motors, Inc. v. Import Motors Limited, Inc., supra,* the question becomes, conceding

motive and opportunity, where is the evidence in this record from which it can reasonably be inferred that anyone of these defendants knowingly did anything to participate in the alleged conspiracy?

██ The evidence as to Hulan Jack indicates that he was President of CCS and had been its Executive Director; that he was a 25% owner of CCS and as such received dividend checks (Ex. 347); that he urged CCS clients to attend a New York City-wide food convention sponsored by AGH in 1968; that he did not make field visits on behalf of the CCS clients, but turned over this task to the CCS field men; that in May of 1968 he sent a letter to the plaintiff Co-op asking for a meeting with the plaintiff's Board of Directors about the CCS-sponsored products; and that no such meeting was held. Plaintiff introduced no evidence and elicited no testimony from Mr. Jack or any other person to indicate that Jack *did* anything or *knew* anything about any actions which were taken on behalf of CCS vis-a-vis the plaintiff after his letter was sent in May of 1968. One could speculate that as CCS President Jack "must have known" what was going on in the organization. But, speculation and surmise may not support a jury verdict and may not substitute on this motion for evidence of some kind that Jack knowingly participated in any conspiracy which might have existed.

As previously stated, Solomon, besides being a one-fourth owner of CCS, was Executive Secretary of AGH, a post he had held since 1945. He negotiated contracts for AGH with Local 338 and he promoted CCS products, both at AGH meetings and on his visits to AGH member stores.

There is evidence from which it could be concluded that he knew of the Overtons' union affiliations and the fact that union influence was one means by which CCS would promote its clients' products. Solomon testified, through his deposition, that he was aware of the Harlem Co-op picket line and may have discussed it with Nestora or Rosenblum or Joseph Overton, although he said he was not certain of this and could recall no specifics of any such discussion.

Were there a scrap of evidence concerning any action Theodore Solomon might have taken which could be construed to have been directed against the plaintiff, or even in support of the picket line, it might not be unreasonable for a jury to infer that he did have discussions with Joseph Overton about the picket line and that he did know of its purpose to promote the CCS-business—assuming a jury were to find this was its purpose—and that he thereby participated in the alleged scheme. But the record is barren of any suggestion of such an action on his part and there is no basis for drawing these inferences.

██ There is evidence that Solomon was present in August of 1968 when—the evidence could be found ˙to show—Linwood Joseph Overton threatened Colin David Cuccia by stating that he could throw Cuccia out of Harlem. However, even if Solomon's presence on that occasion could be interpreted as an affirmation or adoption of Overton's actions as his own, approval of a single act of an agent does not of itself justify an inference of authority to repeat the same or similar actions. See Restatement Agency 2d § 43, comment b.

Harry Rosenblum, besides being a 25% owner of CCS, was associated with two stores in Harlem. He was president of Food Family, Inc. which operated a store at 2667 Eighth Avenue and was the individual owner of a Food Family store located at 756 St. Nicholas Avenue. (Rosenblum dep. at 3–5) The stores had Local 338 union contracts.

██ The principal evidence by which plaintiff seeks to link Rosenblum to the alleged conspiracy is certain testimony from the deposition of William Thomas of Sealtest, read into the trial record on July 3 and 7, 1975. According to William Thomas, a Mr. Rosen, another Sealtest employee, told Thomas that Rosenblum had called him (Rosen) one day after Sealtest had delivered milk to the Har-

lem Co-op and said that Food Family employees were not handling Sealtest products. Rosenblum also allegedly stated that Joseph Overton had been in the store and told the employees not to handle Sealtest products.

Plaintiff has presented no testimony, however, from which it could reasonably be inferred that either the store employees or Rosenblum had any reason to believe such an instruction by Overton, if it was given, had anything to do with the strike at the Co-op or Sealtest's previous delivery there. Nor is there any testimony to indicate that Rosenblum authorized the employees not to handle Sealtest products or even had the authority to do so. To conclude from this testimony in the record that Rosenblum knew of the alleged illegal purpose of the Co-op strike, knew of Sealtest's delivery to the Co-op, and authorized Food Family employees not to handle Sealtest products as a means of coercing Sealtest not to deal with the Co-op so as to put the Co-op out of business would require leaps which could be based on nothing but surmise. This evidence could not support a finding of liability against Rosenblum. There is likewise, no basis in this testimony which would support a finding that the corporation Food Family, Inc. was liable to the plaintiff.

Plaintiff has argued with respect to Jack, Solomon, and Rosenblum that they may be found to have ratified and adopted the alleged illegal actions taken by the Overtons to promote the CCS business. Plaintiff claims the ratification occurred when throughout the strike period these three defendants continued to accept CCS dividend checks.

■ A principal may be found to have ratified or affirmed unauthorized actions of an agent by acceptance of the benefits flowing from those actions. Restatement Agency 2d § 98. And, in this case, a jury could find that the Overtons were authorized to act as agents for CCS. However, there are at least two serious problems which preclude adoption of the plaintiff's theory—that the CCS principals in fact ratified unauthorized actions taken by the Overtons.

■ First, there is no evidence which ties any CCS profits or dividend payments received by the principals to the strike at the Harlem Co-op. Thus, there is no way in which acceptance of these sums could be deemed approval of the strike. Second, for ratification or affirmance to be found under the plaintiff's theory, there would have to be evidence that the principals accepted the benefits flowing from the unauthorized acts with full knowledge of the facts involved. See *Julien J. Studley, Inc. v. Gulf Oil Corp.,* 282 F.Supp. 748 (S.D.N.Y. 1968), *reversed on other grounds,* 407 F.2d 521 (2d Cir. 1969); Restatement Agency 2d § 98. But, as set forth above, there is no evidence of such knowledge on the part of these defendants.

Thus, while at first glance it might seem unlikely that the CCS principals and the corporation did not know of any actions the Overtons might have taken to promote CCS business, analysis of the evidence can lead to no other conclusion than that plaintiff has failed to introduce evidence, of any agency nature or otherwise, to prove such knowledge or to prove participation by these defendants in any conspiracy which might have existed. The motions of defendants Jack, Solomon and Rosenblum must be granted.

*AGH and Nestora.* Surveying the evidence, it is difficult to determine just what plaintiff's theory for holding the Associated Grocers of Harlem liable is. It might have been that AGH would be liable for any actions of its Executive Secretary, Theodore Solomon, carried out in furtherance of the conspiracy, except that, as indicated *supra,* plaintiff has introduced no evidence as to what such actions might have been. The same thing can be said with respect to the AGH president during the conspiracy period, Nestor Nestora. There is no evidence from which to conclude that Nestora did anything to harm the Co-op or that he was aware of or participated in

**1274**

any conspiracy that might be found to have existed. Obviously, therefore, AGH cannot be derivatively liable through Nestora.

█ It is true that CCS products were discussed at AGH meetings and that AGH negotiated Local 338 contracts on behalf of its members. No inference of illegal activity can be drawn from these facts alone, however. The modest rebates, paid to AGH by CCS might have been found to be violations of the Robinson-Patman Act, 15 U.S.C. § 13(a), had plaintiff proven the jurisdictional elements of that act, which it has not. Even then, however, further proof, which is lacking on this record, would have been necessary to show that such violations were committed in furtherance of the conspiracy which is the plaintiff's charge in this complaint.

The motions of defendants AGH and Nestora must be granted.

*Kaufman and Colonial.* Plaintiff has also charged Aaron Kaufman with participation as a core member of the alleged conspiracy. There is no evidence connecting Kaufman to CCS by either an employment or a financial interest. Plaintiff contends, however, that Kaufman's actions demonstrate a participation in the alleged conspiracy.

█ First plaintiff points to the testimony that Leslie Birthright, an employee of Kaufman's Colonial Supermarket, participated in the picketing at the Co-op with the knowledge of Mr. Kaufman. However, Kaufman testified through his deposition that Birthright did not picket during working hours and in any event had never asked for time off to do so. Even if it were assumed that Birthright was on the picket line for some unlawful purpose, an assumption supported in no way by plaintiff's evidence, there is certainly no evidence that Kaufman knew of this purpose or authorized it.

█ The other evidence plaintiff contends connects Kaufman to the conspiracy is the deposition testimony of William Thomas of Sealtest, read into the record on July 3 and 7, 1975, having to do with the alleged refusal of Kaufman's Colonial Supermarket to take Sealtest milk after Sealtest delivered to the Co-op while the picketing was in progress. There is no testimony as to why Kaufman is alleged to have told Sealtest Colonial would not take its products—nor for that matter, any evidence as to why Colonial later resumed taking Sealtest products. William Thomas stated in his deposition that he called Joseph Overton to inquire as to whether there was a problem between Sealtest and Local 338. However, the uncontradicted testimony with respect to that conversation was that there was no discussion about any relationship between Kaufman and Colonial and the Co-op or the strike.

Joseph Overton was said to have suggested that the Colonial employees might be connected with the strike and therefore have been reluctant to handle the Sealtest products. This statement, however, does not support an inference that Kaufman as an individual, or Colonial as a corporation, participated in the conspiracy as charged. The motions of these two defendants must be granted.

*Competitor defendants.* Plaintiff's complaint, as amended pursuant to Rule 15(b), Fed.R.Civ.P., identifies two individual store defendants, three defendants which operate chain stores, and two food wholesaler defendants as "competitor" defendants who allegedly participated in the conspiracy charged.[12] The evidence against the individual stores, Colonial and Food Family, has been discussed, *supra.* The case against the others—Shopwell, Sloan's, Fedco, Associated, Mid-Eastern—will now be considered in terms of motive, opportunity, and overt acts.

---

12. These defendants, listed in Schedule A of the amended complaint are Food Family, Inc., Shopwell, Inc., Colonial Supermarket, Inc., Sloan's Supermarkets, Inc., Associated Food Stores, Inc., Mid-Eastern Cooperatives, Inc., Fedco Foods, Inc., and Nestor Nestora. Al-

though not listed in Schedule A, it appears from the complaint that plaintiff also considers AGH with its member stores to be a competitor with it. AGH's alleged place in the scheme has been discussed *supra.*

It appears from the nature of the complaint, and from plaintiff's arguments during trial and on these motions, that its theory with respect to these defendants is that they were motivated to put the Co-op out of business because they feared its competition with the stores which these defendants operated or with which they were affiliated.

The first problem with this theory of motivation is that plaintiff has introduced no evidence from which it could reasonably be inferred that the stores operated by or affiliated with these defendants were in competition with the plaintiff. In ¶ 19 of the Complaint, the plaintiff identifies the area described as Harlem for the purposes of the Complaint. The evidence could be found to have established that each of these defendants operated or was affiliated with at least one store within this area. However, plaintiff has offered absolutely no evidence to establish that the Harlem area as defined in the Complaint is a single "area of effective competition", see *Standard Oil of Cal. v. United States*, 337 U.S. 293, 299 n. 5, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949), as far as retail food markets are concerned. In fact, what evidence there is points to the contrary conclusion.

As several defendants pointed out during the argument of these motions, plaintiff's own expert witness identified the drawing area of a supermarket in Manhattan as the area within an eight minute walk of the store. (Blythe, 5/21) The head of NYSFMA, another witness called by plaintiff, defined the competitive area of a retail food market as an area of four or six square blocks. (Hildebrand, 6/18) Plaintiff offered no evidence to show that any of the defendants had stores within the area defined in these terms. Thus, there is no evidence from which it could be concluded that any of these defendants were in actual competition with plaintiff for customers. In fact, a third witness, called by plaintiff testified that, in the course of preparing a locational analysis for plaintiff prior to the selection of its store

site, he surveyed the area around the site actually selected and found only one supermarket, a Finast store, to be competitive with that site. (Patton, 5/29) Additionally, apart from evidence of the objective facts, plaintiff has offered no evidence from which it could be concluded that any of these defendants considered themselves to be in competition with the plaintiff.

Plaintiff's claim that these defendants were motivated by fear of the potential competition represented by the plaintiff's supposed expansion plans fares no better. It is true that plaintiff's opening was widely reported and that a high volume of business was predicted. (Exs. 137–148) One of the reports mentioned plans for expansion. (Ex. 140) But, plaintiff presented no evidence to show that any one of the alleged competitor defendants was aware of any of these particular reports. Similarly, no evidence was presented to show that any of the competitor defendants, or any other defendants, knew or would have been likely to know of the Co-op's tentative exploratory efforts at locating a site for a new store. And, even if the defendants had been aware of these efforts, the Court finds no evidence from which a jury could reasonably conclude that any one of these defendants would have had any reason to consider the Co-op to be a likely future competitor within its particular drawing area.

At various points in this litigation plaintiff's attorney advanced the theory that the defendants were particularly wary of plaintiff's competition because its prices were or would be lower than the prevailing ones in Harlem. The evidence as previously discussed belies this claim.

In sum, to conclude that any of the competitor defendants was motivated to join the alleged conspiracy against the Co-op because of fear of actual or potential competition would require sheer speculation. More is required if the plaintiff is to prevail on these motions.

Where a conspiracy charge "rests solely on inference based on circumstantial evidence the failure to offer a credible theory of motivation weighs heavily against the plaintiff." *Loom Crafters, Inc. v. New Central Jute Mills Co.,* 1971 Trade Cases ¶ 73,734 (S.D.N.Y.1971). This plaintiff has failed to do with respect to the competitors.

■ As to opportunity to conspire, *Overseas Motors, supra,* suggests that evidence thereof "may be arranged along a continuum of persuasiveness" from that which shows that communication and therefore agreement were physically possible to evidence of actual contacts and communication." See *Overseas Motors, Inc. v. Import Motors Limited, Inc., supra,* at 534. Most of plaintiff's evidence here suggests nothing more than the physical possibility of conspiracy. For example, plaintiff points out that at the time of the 1969 NYSFMA convention three of these alleged competitor defendants were members of the Association (stipulation of counsel); that individuals associated with some of these defendants served together on professional boards and committees, some of which were connected with Local 338 (Exs. 566, 567); and that most of them had contracts with Local 338 with similar terms in them.

This and comparable evidence may well establish that these businesses, all part of the same industry, are operated in a similar manner and that their representatives sometimes came in contact with one another in the course of their occupational responsibilities. In this Court's view, it goes no further toward establishing plaintiff's conspiracy theory.

■ As to alleged overt acts of these defendants in furtherance of the conspiracy plaintiff's proof is similarly deficient. There is simply no evidence from which to infer that any of these competitor defendants ever authorized an employee to participate in the picket line at the Co-op. The fact that certain checks paid to pickets (Ex. 568) were cashed at stores operated by or affiliated with some of these defendants is probative of no issue in this lawsuit.

■ Plaintiff has argued that both Shopwell and Associated are shown to have participated in the alleged conspiracy because of associations with the alleged non-defendant co-conspirator Alfred Johnson who is alleged to have damaged the plaintiff in some way and to have "interfered" with plaintiff's store. First of all, other than demanding more money than plaintiff's consultants, Blythe and Patton, thought he was worth, the evidence utterly fails to reveal what Johnson is supposed to have done to harm the plaintiff. Second, there is no evidence connecting Johnson to either of these defendants during the period of the alleged conspiracy. Any finding of liability based on Johnson's activities would have to be based on the dual surmise that he did something and that he did it as an agent of one of these defendants. Mere speculation as to such matters may not serve in the stead of probative evidence. See *Syracuse* F.2d 683 (2d Cir. 1963).

Plaintiff claims that defendant Mid-Eastern is liable for participation in the conspiracy, whether or not that defendant is a competitor, on the basis of the actions of its President, Frank Anastasio. Viewed most favorably to plaintiff, the evidence with respect to Anastasio shows that he was very active in national and regional cooperative affairs; that he knew and met with other persons similarly involved; that he favored having one single cooperative organization for New York City and said so; that he was an officer of the Food Trade Alliance and discussed the plaintiff's store with that organization; that at the time the Co-op opened he approached one of the plaintiff's representatives about getting the contracts for Mid-Eastern to supply the Co-op with milk and ice cream, but was unsuccessful; that he believed the contract proposed to the plaintiff by Local 338 was a good contract, said so, and convinced Arthur Danforth of the Co-opera-

tive League of America to say so too; that he signed the agreement executed December 20, 1968 by which it was agreed that a Local 338 contract would be obtained for the plaintiff, even though he was not authorized by the Co-op's Board of Directors to do so; and that he never reported this action to the Board. Having said all of this, it is still unclear to this Court how a jury could do anything but speculate as to whether or how Anastasio or Mid-Eastern knowingly participated in any plot to put the plaintiff out of business. Such a conclusion cannot reasonably be drawn from the mere fact of differences over organizational philosophy and policy, or even from the active role Anastasio played in an effort to promote the acceptance by plaintiff (which itself was a cooperative venture) of the proposed union contract.

Plaintiff has presented no evidence from which it could reasonably be concluded that the competitor defendants participated in any conspiracy to put the Co-op out of business. This is an essential element of both its § 1 and § 2 Sherman Act claims and its claims under New York law. Accordingly, the motions of the competitor defendants must be granted.

*Supplier defendants.* The supplier defendants, i. e., those manufacturers, distributors, suppliers, and service concerns which furnished the plaintiff with goods and services before the picketing, are charged in all counts of the complaint based on allegations that they refused to continue to supply or service the plaintiff, at its store or otherwise, once the picketing began.

■ Assuming for the moment that each of these defendants did in fact refuse to deal with the Co-op—and with some modest exceptions the evidence could reasonably be found to establish that this was the case—it is clear that a supplier has the right to choose *independently* the customers with whom it will deal. See *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,*

416 F.2d 71, 76 (9th Cir. 1969) *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *Ace Beer Distributors, Inc. v. Kohn, Inc.,* 318 F.2d 283 (6th Cir. 1963). To prevail at this stage of the case, plaintiff must, therefore, have established additional facts from which it could reasonably be concluded that these defendants acted in concert. Count 2, which will be discussed first, charges that the supplier defendants agreed among themselves to engage in a group boycott or concerted refusal to deal with the plaintiff.

At oral argument on these motions, plaintiff's counsel essentially stated that the concerted refusal to deal as charged in Count 2 no longer represented its theory of the case. Although plaintiff did not expressly abandon this Count, it might well have done so for analysis of the evidence shows a complete failure of proof with respect to any horizontal conspiracy among the supplier defendants.

In the absence of direct proof of a horizontal conspiracy, plaintiff relied, in its earlier arguments, on the theory of conscious parallelism to establish the existence of an agreement among these defendants, based on the refusal of each to deal with the Co-op. See *Interstate Circuit v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). Plaintiff's evidence, however, was insufficient to establish a conspiracy on this basis.

■ Plaintiff has failed to demonstrate true parallelism in the actions of these defendants. While exact uniformity of detail is not required, see *Delaware Valley Marine Sup. Co. v. American Tobacco Co.,* 297 F.2d 199, 204 (3d Cir. 1961), *cert. denied,* 369 U.S. 839, 82 S.Ct. 867, 7 L.Ed.2d 843 (1962), more than a general similarity of action is required for a finding of consciously parallel behavior. See *Independent Iron Works, Inc. v. United States Corp.,* 322 F.2d 656, 661 (9th Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963). In this case, the most significant variation in the defendants' conduct at the very outset is that a number of them did in fact deal with the plaintiff to

some extent during the period of the picketing. Sealtest delivered once to the curb and several times to the plaintiff's office; White Rock delivered to the office on several occasions; Hobart sent serviceman to the Co-op on two occasions.

Any suggestion of conspiracy or agreement which might arise from parallel conduct is lessened considerably where such conduct occurs in the context of common "outside" factors, existing independent of and prior to any actions by the defendants and to which such actions might reasonably be considered a response. See *Independent Iron Works, Inc. v. United States Steel Corp., supra,* at 661–62. Here, the existence of the picket line in front of plaintiff's store, serving as both a physical and symbolic barrier to those who would cross it, is such a "common factor" which cannot be ignored.

■ But plaintiff's case for conscious parallelism is even more seriously weakened by the failure to introduce any evidence to show that any of these supplier defendants were aware of the responses of the others to the picket line. Such knowledge or consciousness is an essential element of this theory of the case. See, e. g., *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). Plaintiff's proof in this regard has extended little further than showing that many of these defendants belonged to one or more of the same trade associations and/or attended the same conventions during the time period at issue here. No evidence of any communication at all, let alone of communication about the plaintiff, has been offered. In the absence of such evidence, a showing of common membership is simply not probative of a conspiracy or any element of conspiratorial activity. See *Maple Flooring Manufacturers Ass'n v. United States,* 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925); *Pacific Tobacco Corp. v. The American Tobacco Co.,* 1974 Trade Cases, ¶ 74,991 (D.Ore.1974).

■ The Court finds, therefore, that plaintiff has not made a showing from which a jury could reasonably find that consciously parallel behavior existed among these defendants. Even if plaintiff had made such a showing, however, it is well established that consciously parallel business behavior does not of itself constitute a violation of the antitrust laws. See *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., supra,* 346 U.S. at 541, 74 S.Ct. 257; *Modern Home Institute, Inc. v. Hartford Acc. & Ind. Co.,* 513 F.2d 102, 110 (2d Cir. 1975); Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal,* 75 Harv.L.Rev. 655, 658–59, 681 (1962). Some "plus" factors must be present, such as a showing that the actions of the defendants were inconsistent with normal independent business methods, see *Independent Iron Works, Inc. v. United States Steel Corp., supra,* at 663; that it would have been more in the interests of these defendants as a group to have acted differently than they did, see *Dipson Theatres, Inc. v. Buffalo Theatres, Inc.,* 190 F.2d 951, 956 (2d Cir. 1951), *cert. denied,* 342 U.S. 926, 72 S.Ct. 363, 96 L.Ed. 691 (1952); or that the actions taken by any one of the defendants would be in its own economic interest only if taken in concert with all the others. See *Interstate Circuit, Inc. v. United States, supra,* 306 U.S. 208 at 225, 59 S.Ct. 467. No evidence sufficient to support such a finding has been presented in this case. In particular, plaintiff has advanced no theory as to why these suppliers, who were almost without exception engaged in different lines of commerce and were not in competition with each other or the plaintiff, should have banded together in a concerted refusal to deal. See *United Shoppers Exclusive v. Broadway-Hale Stores, Inc.,* 1966 Trade Cases, ¶ 71,727 (N.D.Cal. 1965) at 82,278–79.

In sum, aside from the fact that the plaintiff appears to have abandoned this theory, the Court concludes that a jury could find a horizontal conspiracy among

the supplier defendants in this action, only by means of outright speculation. Accordingly, the motions of the supplier defendants must be granted in their entirety with respect to Count 2 of the complaint.

██ Count 1 of the complaint charges the suppliers with participation in a mass conspiracy, embracing all of the defendants in this action. At oral argument, plaintiff described this theory of the case as a "rimless wheel" conspiracy, as set forth in *Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc.*, 459 F.2d 138 (6th Cir. 1972). The Court there identified the elements to be shown to establish such a conspiracy as: the existence of an overall-unlawful plan or "common design"; knowledge that the plan exists and that others must be included, inferable from the nature of the enterprise, although knowledge of the identity of such persons is not required; and a showing of each member's knowing participation in the scheme. See *id.* at 146 and cases cited therein.

The Court has already found that in this case there exists evidence from which a jury could infer that some conspiracy directed against the plaintiff was in existence. Further, the evidence shows that coincident with the appearance of the picket line, which could be found to have been in furtherance of the conspiracy, the suppliers failed to provide normal service to the plaintiff. The question becomes, therefore, whether, assuming the jury were to find that a conspiracy as charged did exist, there is also evidence from which the jury could infer that any of the suppliers knew of the conspiracy and participated in it, in other words, whether a "conscious commitment" to the scheme on the part of these defendants can be inferred. See *Standard Oil of Cal. v. United States, supra.*

Any attempt to base a finding of participation by the suppliers in the alleged Count 1 conspiracy on a theory of conscious parallelism must fail for the same reasons already set forth, *supra*, with respect to Count 2. Plaintiff's circumstantial evidence must be examined again, therefore, in terms of motive, opportunity, and consistency of overt acts.

Plaintiff contends that the overt act of each of these defendants which demonstrates its participation in the conspiracy is the refusal to provide normal delivery to the plaintiff's store, or alternative service as requested by Mrs. Harris or Mrs. Badon, e. g., by delivering to the office, or a street corner, etc., during the period of the picketing. With respect to all of these defendants plaintiff asserts they each had two motives for entering into the conspiracy in this manner.

First, plaintiff claims, principally in its evidentiary memorandum, that each of these defendants was committed to doing business in a particular manner in Harlem, to wit, through store managers and assistant managers who were members of Local 338; that plaintiff resisted this method of doing business; and thus, to protect that method, the suppliers honored what they knew to be an illegal picket line aimed at forcing the Co-op to place its managers under the Union's control.

There is evidence from which one could conclude that most of the food markets in the Harlem area which had Local 338 contracts also had their management personnel covered by the union contract. (Exs. 570–576a, 589–90) And there is evidence to support the claim that the Co-op did not wish to have its managers so covered. Plaintiff has offered no evidence, however, which supports its theory that these basic facts motivated each or any of the supplier defendants to participate in a conspiracy.

██ There is no evidence for instance which shows that any of these defendants knew whether or not any of the stores with whom they dealt, including plaintiff, had management personnel who were in or out of the Local 338 bargaining unit. There is no evidence to show that they attempted to find out, or were concerned with this issue in any way. Further, even if they were concerned about it, there is absolutely no evidence from which to infer that any of

these defendants knew that this issue was the cause of the picketing at the Co-op.

Finally, and most importantly, there is certainly no evidence from which it could be inferred that any of these defendants knew or thought that the purpose of the picket line was to obtain favorable treatment for CCS-sponsored product lines. In short, this theory of motivation is completely unsupported by the evidence. Only sheer, impermissible speculation could lead a jury to conclude that a concern over whether or not the Co-op's managers were covered by the Local 338 union contract motivated any one or all of the suppliers not to deal with the plaintiff.

■■■ Plaintiff's alternative theory of motivation is that each of these defendants was coerced by the "core" or "competitor" defendants into refusing to sell to the plaintiff—primarily through threats that their business in other parts of Harlem would be terminated. With the exception of the Sealtest-Colonial-Food Family incidents, discussed *infra* and *supra,* there is no direct evidence of any threats to any of these defendants. Again, plaintiff would have the jury infer that threats were communicated to the suppliers through the various trade association meetings and conventions some of the suppliers attended along with various of the competitor and core defendants. However, there is no evidence whatever from which a jury could draw the conclusion that such communications which *could* have taken place actually occurred. The fact of common attendance at such meetings, without more, is simply not probative of issues relating to an alleged conspiracy. See *United Shoppers Exclusive v. Broadway-Hale Stores, Inc., supra,* at 82,271. Thus, with respect to all but one of these defendants, there is no evidence of any threat or coercion having been communicated to them. For the same reasons, there is no evidence rising above the level of "mere possibility" addressed to

their opportunity to conspire with any of the other defendants.

■■■ Even if a finding of coercion against the suppliers would be reasonable, that would not, of itself, support a finding of conspiracy. For example, there is evidence as to Sealtest from which a jury could conclude that it was subjected to some coercion as a result of having delivered to the Co-op while the picket line was outside. Even if such a conclusion were reached by a jury, it would not support a further finding of participation in any alleged conspiracy absent evidence that Sealtest acquiesced, knowing of the existence and purpose of the conspiracy. See *Johnson v. J. H. Yost Lumber Co.,* 117 F.2d 53, 62 (8th Cir. 1941); *Vandervelde v. Put and Call Brokers and Dealers Association,* 344 F.Supp. 118, 140 (S.D.N.Y.1972); Timberlake, *Federal Treble Damage Antitrust Actions,* § 16.07 (1965). There is no evidence from which it could be inferred that Sealtest, or any other defendant whom a jury might find was coerced into observing the picket line, had any knowledge that the purpose of the picketing was to pursue an end in violation of the antitrust laws.

Plaintiff's failure to offer a credible theory of motivation, and to proffer evidence from which the occasion of conspiratorial planning could reasonably be inferred, is, in itself, fatal to its contention that a jury could find the refusal of the suppliers to deliver to the store or to make alternate arrangements for delivery to have been the result of a conspiracy with the core defendants or any other defendants. There are still other factors present with respect to many of these defendants which also preclude a finding of conspiracy based on a "refusal to deal."

■■■ Several of the defendants, e. g., Arnold and Goya, dealt with plaintiff through franchised dealers or independent brokers. Plaintiff has not shown that these companies participated in or authorized the decisions of these persons not to deliver to the Co-op. Further-

more, as to these defendants, and others as well, there has been no showing that they had any facilities for making alternate arrangements for delivery to the plaintiff or provided such service to persons in similar situations as a matter of course. No inference of conspiracy can be drawn from the fact that a defendant continued to do business in its usual fashion, just because the plaintiff would have preferred that it act otherwise. Cf. *United Shoppers Exclusive v. Broadway-Hale Stores, Inc., supra,* at 82,272–73, 82,275.

As to those defendants whose products were sponsored by CCS, i. e., White Rock, ITT Continental, and Bordens, plaintiff argues there is additional reason to infer their participation in the alleged conspiracy since these defendants had contracts with CCS and benefited from precisely the system the Overtons and Faust were attempting to promote through use of the strike. However, analysis of the position of the CCS-sponsored products in the plaintiff's store makes it difficult to find that an inference of participation in the alleged conspiracy by the CCS clients could reasonably be drawn.

█ White Rock sold to the plaintiff beginning in July of 1968. (White Rock Ex. A, C) Plaintiff's witness, Blythe, testified that in the fall of 1968 he reported to the appropriate store committee that White Rock was in the store and was overstocked. However, he also testified he did not know whether White Rock was an authorized supplier or not. And, the evidence reasonably lends itself to the conclusion that, far from dropping off after Blythe's report, with the exception of one month, White Rock sales increased dramatically in the fall and winter of 1968 and spring of 1969—right up to the time of the picketing. Further, since White Rock Exhibit A, a notice to admit to which the plaintiff did not respond, establishes conclusively for the purpose of this litigation that White Rock made three deliveries to plaintiff's office during the strike and refused no order placed by plaintiff, there is no evidence from which a jury could conclude that White Rock did anything in furtherance of the alleged conspiracy.

Drake Bakeries, a division of Bordens and a defendant in this lawsuit, did not manufacture products promoted by CCS. The Bordens contract with CCS was limited to milk and ice cream. Further, the evidence is that CCS sponsored only one line of any given type of product and there is uncontradicted evidence that the cake line it sponsored was Hostess cakes, manufactured by ITT Contintental. Thus, for the Drake Division of Bordens, which was selling its products in the Co-op before the strike began, to have refused to deal with the plaintiff in order to further a conspiracy aimed at promoting the CCS-sponsored products, would have placed it in the incongruous position of boycotting the plaintiff in order to force the plaintiff to take more of the products of Drake's competitor, Hostess. One witness testified that Bordens was interested in getting its milk into plaintiff's store. (Doherty, 6/23) However, the same witness stated that in March of 1969, one month before the strike, Bordens was satisfied with the work being done for it by CCS.

According to all the testimony, ITT Continental products sold exceptionally well in the Co-op. In fact Wonder Bread sold about $200 worth of bread each week which was about four times the average amount of sales in Harlem stores. Plaintiff wishes the jury to infer that this defendant participated in an effort to drive its best customer out of business in order to promote a system without the benefit of which it was already selling more bread at the Co-op than it was selling in any other store in the Harlem area. Plaintiff has directed the Court's attention to no evidence from which this conclusion could reasonably be drawn.

Even assuming that a jury could find from the evidence presented on plaintiff's direct case that the CCS clients would have considered it in their interest to boycott the plaintiff—a good custom-

**1282**

er—in order to promote the "CCS system," a finding of "conscious commitment" to the CCS-oriented scheme would require some evidence from which it could be inferred that these defendants knew of the conspiracy and committed themselves to it. In actual fact, what evidence there is regarding their contacts with CCS and the persons affiliated with that organization is to the effect that no complaints were made with respect to the Co-op at any time, either before or during the strike.

Further, although there is evidence, cited earlier, from which it could be inferred that representatives of these CCS clients knew of Joseph Overton's connections with both CCS and Local 338 during the time in which they contracted with CCS, those who were asked directly whether they ever discussed the Co-op or the strike with Joseph Overton answered in the negative.

In sum, the Court must conclude that with respect to the CCS clients, as well as the other supplier defendants, even though there is evidence from which it could be concluded that the actions of these defendants furthered the aims of the Overton-directed conspiracy, if such were to be found to have existed, there is no evidence from which to conclude that these supplier defendants were knowing participants in such a scheme. Therefore, the motions of these defendants must also be granted with respect to Count 1 of the Complaint.

*The Union.* The evidence in this case is such that a jury, properly instructed, could conclude that the Union's immunity under the antitrust laws had been lost in that actions taken by Linwood Joseph Overton resulted in a combination of Union power with that of non-labor, business forces to promote ends prohibited by the antitrust laws. The question of the Union's liability as an entity for the acts of its agent has been identified as a separate issue.

Section 6 of the Norris-LaGuardia Act, 29 U.S.C. § 106, provides that under circumstances such as those present in this case, a Union will not be liable for the unlawful acts of its individual officers, members, or agents "except upon *clear proof* of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof" (emphasis added).

The evidence in this case, again viewed as it must be, in the light most favorable to the plaintiff, shows that Joseph Overton had exclusive jurisdiction of Local 338 affairs in the Harlem area and that he was authorized to sign union contracts on behalf of 338, so long as they related to the Harlem area. (Sum, 6/25) Joseph Overton was the leading participant in the negotiations with the plaintiff, both before and after the strike began. It was not until November of 1969 that Julius Sum, as President of the Union, first attended a negotiating session with the plaintiff—despite the evidence showing this was the first Local 338 strike in twenty years. (Sum, 6/25) And at that meeting, Sum told the plaintiff's labor lawyer, Harold Young, that Joe Overton was the person responsible for the negotiations.

■ There is no requirement, in order for a union to be liable under § 6, that the union give explicit authority to its officers or agents to violate the Sherman Act in the context of a labor controversy, or that it give express prior approval of actions of its officers which may constitute such violations. See *United Broth. of Carpenters & Joiners of America v. United States,* 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 (1947). The custom or regular practice of a union may provide the source for inferring authorization for an officer to act to bind the union. See *id.* "If a union delegates to an agent unrestricted authority going beyond the norms of union conduct, § 6 does not immunize it from liability for his illegal acts." *Harlem River Consumers Cooperative, Inc. v. Associated Grocers of Harlem, Inc.,* 450 F.2d 271, 274 (2d Cir. 1971).

■ On the record as it stands at the end of the plaintiff's case, the Court concludes that a jury could find that Local

338 had authorized, as that term is used in relation to § 6, any actions Joseph Overton may have taken in violation of the Sherman Act. Having determined that on the present record a jury could find the Union liable under an authorization theory, it is unnecessary at this point in the trial to consider plaintiff's alternate argument that the Union ratified Overton's conduct after acquiring actual knowledge thereof.

### Discussion, State Claims

Plaintiff's third cause of action charges that the various actions of the defendants alleged with respect to the first and second causes of action also constitute violations of the New York State common law prohibiting combinations and conspiracies in restraint of trade. The third cause of action does not charge any of the defendants with liability for individual actions; nor does it allege any facts beyond those set forth as to the first two causes of action.

■ The complaint purports to charge the defendants with a violation of the common law. The Court notes, however, that throughout this century the New York law with respect to trade conspiracies has been codified and is presently embodied in the Donnelly Act, § 340 of the General Business Law. Particularly in view of the fact that the third cause of action charges only concerted action by the defendants, the Court concludes that this cause of action can be read most fairly to all parties as charging a violation of § 340 of the General Business Law.

■ Like § 1 of the Sherman Act, § 340 prohibits only concerted action. The statute prohibits "every contract, agreement, arrangement or combination" by which a monopoly is or may be established, or competition and free trade may be restrained. The term "arrangement" has been interpreted in a way which gives the Donnelly Act a scope somewhat broader than that of § 1 of the Sherman Act. See *People v. American Ice Co.*, 120 N.Y.S. 443 (1909). However, some showing of concerted action is still an essential element of proof under this section.

■ As set forth, *supra*, this Court has concluded that plaintiff has failed to introduce evidence from which a jury could reasonably conclude that thirty-five of the thirty-eight defendants on trial engaged in the concerted action charged in this case. This conclusion applies with equal force to the state law cause of action. Accordingly, as to all defendants other than Linwood Joseph Overton, Lawrence J. Overton, and Local 338, the Court concludes that the plaintiff's proof has failed as to this essential element of the third cause of action.

This brings to a close the analysis with respect to the evidence in support of plaintiff's charges that the thirty-eight defendants on trial participated in an agreement or conspiracy against it to drive it out of business. The Court has concluded that with the exception of the defendants Joseph Overton, Lawrence Overton, and Local 338 and the non-defendant alleged co-conspirator Leonard Faust, the plaintiff has failed to produce evidence from which it could reasonably be concluded that these defendants participated in the alleged conspiracy against it. Since proof of such participation is an essential element of the plaintiff's case against all defendants, the motions of the other thirty-five defendants must be granted at this time. It remains to be considered whether, if a jury were to find that the agreement or conspiracy among the Overtons, Faust and the Union existed, plaintiff has proven facts from which it could also be found that the agreement constituted a violation of either § 1 or § 2 of the Sherman Act or the Donnelly Act, as charged in the complaint.

■ *Section 1.* The language of Section 1 of the Sherman Act is absolute in prohibiting "*[e]very* contract, combination . . . or conspiracy, in restraint of [interstate] trade or commerce . . . ." (Emphasis added.) However, this section has long been interpreted to prohibit only unreasonable re-

straints. See *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). The "rule of reason" set forth in that case was later explained by Justice Brandeis in these terms:

"Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition." *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).

The efficacy of the "rule of reason" as a measure of the legality of economic conduct was reaffirmed in *White Motor Co. v. United States*, 372 U.S. 253, 261–62, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

There is a well established exception to the "rule of reason." It is concerned with "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. R. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).

Among the practices to which this *per se* rule of illegality has been applied have been certain group boycotts or concerted refusals to deal. See, e. g., *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.*, 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators Guild of America, Inc. v. Federal Trade Comm'n*, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

■ Where a group boycott has occurred, it may be, as it is here, that those defendants who in fact chose not to deal with the plaintiff may not be held liable because there has been no showing that they acted in concert with any other defendant. Such a result, however, will not preclude a finding of *per se* illegality with respect to the conduct of those defendants found to have induced the boycott by joint action. See *Johnson v. J. H. Yost Lumber Co., supra,* at 57; *Vandervelde v. Put and Call Brokers and Dealers Ass'n, supra,* at 140. The fact that peaceful persuasion may be the means for inducing a refusal to deal is also not determinative of the issue of liability. See *Cooperativa de Seguros Multiples De Puerto Rico v. San Juan,* 294 F.Supp. 627 (D.P.R.1968); *Caldwell-Clements, Inc. v. Cowan Publishing Corp.,* 130 F.Supp. 326 (S.D.N.Y. 1955). In fact, a group boycott in violation of § 1 may be found on the basis of group action which has the *effect* of inducing suppliers not to deal with the business which is the object of the boycott, even though there is no evidence of communication between those inducing the boycott and those choosing not to deal. See *Vandervelde v. Put and Call Brokers and Dealers Ass'n, supra.*

In group boycott cases "[t]he touchstone of *per se* illegality has been the purpose and effect of the arrangement in question. Where exclusionary or coercive conduct has been present, the arrangements have been viewed as 'naked restraints of trade', and have fallen victim to the *per se* rule." *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Com.,* 467 F.2d 178, 187 (5th Cir. 1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973).

■ Applying those principles to the facts of this case as they appear from the record at the close of plaintiff's evidence, the Court cannot say that a jury, properly instructed as to the law, could not find a violation of Section 1 of the Sherman Act. As discussed, *supra,* there is evidence from which a jury could conclude that there was an agreement among certain defendants to place a

picket line in front of plaintiff's store to further their own business ends. A jury could conclude the line had the effect of inducing suppliers not to deal with the plaintiff. And a jury could find this inducement was intended to have an exclusionary and coercive effect upon the plaintiff.

It can be noted at this point that most of the group boycott cases deal with instances of competitors excluding other competitors, see *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Com., supra,* at 186–87 and cases cited therein. Here, the CCS business is not in competition with the plaintiff in a traditional sense. However, there are also group boycott cases where the objects of the boycott were not competitors. See, e. g., *Fashion Originators Guild of America v. Federal Trade Comm'n, supra.* Even if some finding of an attempt to foreclose competition were required for a finding of *per se* illegality, there is evidence from which a jury could conclude that CCS interests and those of the plaintiff were in competition over the issue of who would control the allocation of shelf space and the placement of products within the plaintiff's supermarket.

The Court finds therefore that on the present state of the record a jury could find a *per se* violation of § 1 of the Sherman Act effected by the combination of Joe Overton, Larry Overton, Lenny Faust, and Local 338. This finding makes it unnecessary, for the purpose of these motions, to consider whether or not a finding of liability could also be based on a "rule of reason" analysis.

*Section 2.* The exact nature of plaintiff's claim under Section 2 of the Sherman Act is not clear from the complaint. (See ¶¶'s 28–35.) The thrust of the charge appears to be, however, that the defendants' conduct, in allegedly entering into a conspiracy against the plaintiff constituted a conspiracy to monopolize in contravention of § 2 of the Sherman Act, as well as a conspiracy to restrain trade in violation of § 1. [To the extent that the complaint might be read to charge either monopolization or an attempt to monopolize, plaintiff's failure to produce any market data from which the degree of actual or likely market dominance could be determined would necessitate a conclusion that it had failed to prove essential elements of a *prima facie* case against any of the defendants under either a monopolization or an attempting to monopolize theory. See the discussion in *Bowen v. New York News, Inc.,* 366 F.Supp. 651, 673–77 (S.D.N.Y.1973), *aff'd in part and reversed in part,* 522 F.2d 1242 (2d Cir. 1975).]

The Court finds that there is not sufficient evidence upon which a jury could reasonably find that participation by the defendants in the alleged conspiracy could be determined to constitute a conspiracy to monopolize under § 2.

The essential requirement of a § 2 claim of conspiracy to monopolize is a showing of specific intent to monopolize a designated section of commerce. See *Bowen v. New York News, Inc., supra,* at 1258; *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co., Inc.,* 510 F.2d 1140, 1144 (2d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2416, 44 L.Ed.2d 679 (1975); *United States v. Consolidated Laundries Corp.,* 291 F.2d 563, 573 (2d Cir. 1961). The Court of Appeals for this Circuit has held that proof that a group of competitors took concerted action to drive independent competitors out of business is sufficient to show specific intent to monopolize. See *United States v. Consolidated Laundries Corp., supra.* But no inference of such action by competitors of the plaintiff could possibly be drawn from the plaintiff's evidence in this case. Nor has plaintiff produced any evidence of a comparable nature from which this essential element of specific intent could reasonably be inferred as to any of the defendants here.

In accordance with these conclusions, the motions of *all* the defendants must be granted with respect to so much of

plaintiff's complaint as charges a violation of § 2 of the Sherman Act.

*Donnelly Act.* The next question to be addressed is whether the evidence at the end of the plaintiff's case would support a finding of liability against the Overtons and Local 338 as to the plaintiff's state law claims.

The New York law under § 340 of the General Business Law is substantially similar to the federal law under § 1 of the Sherman Act. Certain decisions suggest, however, that under New York law, a "rule of reason" analysis must be applied to Donnelly Act claims rather than the *per se* approach applied, *supra*, as to § 1 of the Sherman Act. See, e. g., *Triple D & E, Inc. v. VanBuren*, 72 Misc.2d 569, 339 N.Y.S.2d 821 (Sup.Ct.Nass.Co.1972), *affirmed*, 42 App. Div.2d 841, 346 N.Y.S.2d 737 (2d Dept. 1973); *In re Freeman's Estate*, 40 App. Div.2d 397, 341 N.Y.S.2d 511 (4th Dept. 1973), *affirmed*, 24 N.Y.2d 1, 355 N.Y. S.2d 336, 311 N.E.2d 480 (1974). Be that as it may, the Court is satisfied that under New York law the plaintiff's evidence could support a finding of liability against these three defendants based on the alleged combination of business and union power which allegedly induced the plaintiff's suppliers not to deal with the Co-op. See *People v. Masiello*, 177 Misc. 608, 31 N.Y.S.2d 512 (Sup.Ct.N.Y.Co. 1941), *aff'd*, 271 App.Div. 875, 66 N.Y. S.2d 641 (1st Dept. 1946). The motions of the Overtons and Local 338 must be denied as to the third cause of action.

## Conclusion

Whether the plaintiff Co-op was harmed by the commission of some form of commercial tort, or possibly by breaches of contract, or whether it was the subject of individual violations of various antitrust provisions, such as, discrimination in delivery services between the plaintiff and other customers are issues which are *not* before this Court. For reasons sufficient to itself, plaintiff has not chosen to assert such claims. It did charge a massive industry-wide conspiracy embracing representatives of various facets of the retail food business to expel it from the marketplace if it would not yield and do. business in a certain manner. Thus, the question the plaintiff chose to put before the Court was *not* whether Harlem River Consumers Co-op Inc. was harmed as such, but whether or not any or all of these 38 defendants joined together in a concerted effort and with a concerted purpose that was in violation of the particular federal and state antitrust statutes which were made the subject of this suit.

Having carefully reviewed all of the evidence, most favorably to the plaintiff as the Court is required to do at the close of the plaintiff's case, and having heard and considered the arguments of counsel, this Court finds that the plaintiff *has* presented sufficient substantial evidence from which a jury, properly instructed as to the law, could, if it should choose to, find liability, as previously discussed, as to the defendants Linwood Joseph Overton, Lawrence J. Overton, and the union, Local 338, as to those claims within the first cause of action charging violations of § 1 of the Sherman Act and the third cause of action under the Donnelly Act. Plaintiff has not introduced sufficient evidence with respect to its claims against these defendants under § 2 of the Sherman Act and those claims are dismissed. Plaintiff has *not* met its burden as to the remaining 35 defendants. Accordingly, the motions as to each of them made pursuant to Rule 50(a) and Rule 41(b) Fed.R.Civ.P. are granted.

In sum, the motions of defendants Linwood Joseph Overton, Lawrence J. Overton, and Local 338 are denied as to so much of the first cause of action as charges a violation of § 1 of the Sherman Act and as to the third cause of action. The motions are granted as to the § 2 claims in the first cause of action.

The motions of the remaining 35 defendants are granted and as to those defendants the action is dismissed in its entirety. The preliminary injunction is-

sued by this Court on November 25, 1970 against defendants CCS, AGH, Jack, Solomon, Rosenblum, Nestora, and Kaufman is hereby vacated.

Any defendant whose motions have been granted and who has not already done so is directed to settle an appropriate order on notice.

So ordered.